May it please the court, my name is Kevin Lowe and I'm appearing on behalf of Petitioner Maria Legarda-Bugarin. I'd like to reserve two minutes of my time for rebuttal. Since 2016, thousands of drug users like Petitioner have been executed in the Philippines. Faced with torture and death at the hands of police officers and vigilantes hired by the government, she applied for protection under the Convention Against Torture. In denying her relief, the Immigration Court and the BIA committed three legal errors that require remand. First, the torture risks that Petitioner thoroughly documented in the record were never assessed in the aggregate. This court has made it clear that an overall assessment of torture risk must be done and that it is legal error to only consider each potential source of torture individually. Specifically in this case, Ms. Legarda-Bugarin would be identified as a drug user in three ways. First, through her criminal record which include references to her meth addiction as well as the complication of meth in her conviction. Secondly, by her high risk of drug relapse upon removal. And third, through a drug watch list to which community leaders and neighbors and other people could add her to. Once she is identified as a drug user, she could then be tortured and killed by the government. Instead of aggregating these three torture risks, what the Immigration Court instead did was to arrange these three occurring. Specifically, Ms. Legarda-Bugarin was required to show first that the Philippines has her criminal record, that she would then be detained, that her name would then be added to a watch list, and finally that she would then be killed. There are numerous problems with this chain of events analysis as applied to this case which set an improperly high burden for cat protection. First of all, as a threshold matter, this chain of events analysis should not have been applied to this case in the first place because the torture risks were supported by substantial evidence. In this case, the Board of Immigration Appeals and the Immigration Court both relied heavily on matter of JFF. But this case is not relevant because it only involved one torture theory that did have reliance. Can I ask you why page 11 of the IJ decision, which is at page 69 of the record, doesn't have a list that is being considered in the aggregate? The IJ lists a lot of things and then ultimately says this is not enough. How is that not looking at the issues in the aggregate? Sure, I'm happy to speak to that, Your Honor. I would also point to page 66 where the Immigration Court does arrange those torture risks into a chain of events analysis. What we see on page 69 of the Immigration Court decision are simply five factors that the Immigration Court addresses. But as I will point out, I'm happy to point out ways in which this doesn't account for all the torture risks that Ms. Lagarde-Boubourin substantiates in the record. So it is missing parts of the analysis. And due to the fact of the earlier reliance on matter of JFF, we can see that the torture risks in being arranged into that dependent chain of links, where A leads to B, leads to C, leads to D, in a way that the torture risks are not reflected in the record. Sorry, what is missing from the list on AR 69? I think one thing to note that's definitely missing is the fact that the DIA and the IJ don't even mention the torture risks of community members or neighbors, adding her to a drug watch list, which is a key way that people are identified. But that goes to your other argument from the few pages earlier, too, that I don't really understand. Because wouldn't the drug watch list follow either from knowledge of her prior drug use or from a relapse? So it is kind of part of a causal chain. The reason you get on the list is because either they figured out about your past use or they know about new use. I hear your question, Your Honor. I think while there are ways that each of the torture risks could aggravate the other ways in which it can raise the possibility that she's identified, there is no necessary connection between the drug watch lists requiring a relapse or requiring any kind of identification through her past conviction documents. In the record, as the Human Rights Watch Report and the Amnesty International Report point out, there are many situations, specific examples that they cite where people who have not been identified as a drug user through their conviction records, have not had a drug relapse, are nonetheless killed. So there is no requirement. So why do they get put on the list? Is the idea that just random people get put on the list? It's sort of, I wouldn't necessarily say random, but in the Human Rights Watch Report, I would identify, I would point the court towards, in the administrative record on page 830, the Human Rights Report details the fact that being added to a watch list is simply a matter of hearsay and community rumor. Like there's no evidence that needs to be proffered. And something that the police even admit to in the Philippines is that they don't verify the accuracy of the lists and that it's up to community leaders to remove people who are placed there wrongly. Is there any indication, I mean, it might be hearsay, but is there any indication that absent past drug use or new drug use that you'd get put on a drug list? There are, Your Honor. I would point the court towards the declaration of Dr. Vicente Rafael, where he talks about the fact that there are returning migrant workers to the Philippines that simply based on rumors, they end up, some end up getting put on watch lists, some end up being killed. I think throughout both the reports by Amnesty International, as well as by Human Rights, there are plenty of incidents that they cite with specific names of people who have been killed where there is no connection between whether or not they had conviction documents, whether or not they had relapse. It was simply rumors that they used to use meth or that there were rumors that they had recently used the drug. And that's why each of the torture risks should be considered independent, even if they can be aggravating factors for each other. Can I ask a question on a different topic? I read the BIA's decision as relying in part on the low, well, the relatively small percentage of folks who are identified as drug users, whether past or present, who end up actually being killed, right? And so given that it's your client's burden to show this greater than 50% chance that that will happen to her, what, I guess I just like to hear you address that point, because it seemed to me that could be on its own a problem, perhaps, from the standpoint of your client meeting her burden. Yes, I'm happy to speak to that point. I think one thing is that the BIA never even reached the identification part of the analysis. But I believe that the section that Your Honor is referring to is the note that only 1.2 million people who surrendered themselves to the government ended up being put on watch lists. And then I think the government as well as the BIA then take the figure given by our expert, Dr. Vicente Rafael, where he says that at that time, he did the declaration, 8,000 people were killed. What the government and the BIA both do is then they make that simple fraction of putting 8,000 people over 1.2 million people who had turned themselves in, and tries to do that fraction, and they end up with something below 1%. And then says, that's not the CAT standard requires. But I would submit that the CAT standard doesn't require 50% of the drug users in the Philippines to be killed either in order to extend protection to the petitioner. I think one thing to point out is that, I think two things to point out, actually. One is that out of the 1.2 million people identified in the situation, it only accounts for the people who surrender themselves to the government and end up on watch lists. What we're talking about here is three separate ways in which she could be identified as a drug user that are independent from her surrendering herself or being added to a watch list. But isn't surrendering even more specific? I mean, it seems like if someone comes to the government and says, I am a drug user, then you don't even have the rumors you were talking about before. You have an admission. So why is it riskier to have rumor instead of an actual admission? Yes, Your Honor. I think in this point, I think it's the people who surrender themselves to the government as drug users, there are probably many ways that they're doing the surrendering. Not all of them may end up on drug watch lists. Not all of them may end up coming to the attention of the government in terms of the people that they're employing to actually kill and target the drug users. It isn't a operation where everyone that comes in is guaranteed to be killed. But as I look at the 1.2 million people and say that we would require 600,000 of them to be killed. Another thing to note is something that both Human Rights Watch and Amnesty International put as a almost as an asterisk on their reports is that a lot of the accounts that they're able to log of how many people were killed are not are simply not accurate counts. They believe that the number typically is much higher. Throughout our briefing, we definitely went with more conservative estimates of 8,000 people killed. But there's certainly human rights reports and other human rights watch organizations that have cited tens of thousands. Well, I'm willing to grant the more extreme numbers that you're citing. I guess, though, what we're trying to review is whether the evidence compels a conclusion contrary to the one that the board reached. And I hear you. You don't have to come forward with evidence that, you know, 600,000 people were slaughtered to get cat relief. I'm with you on that. But I guess when the you know, when the relatively large number of people who come to the government's attention as drug users, and that's really your client's sole claim to to fear torture, is that I'm a member of that same group. Right. I'm in that pool of people who would come to the government's attention. If it turns out, though, that at least on the evidence we have before us that a relatively small number of those people actually suffer what would amount to torture, I guess I'm still I'm really not satisfied by your your response to my question is simply, well, I don't have to show that 600,000 people died. OK, that's that's fine. But, you know, we're trying to review whether the evidence compels a conclusion in your client's favor. And I'm just not. Is there something more you have to add on that point? I guess there is. Your Honor, I think beyond the generalized information about how many drug users were the court to look at the fact that in the record there is petitioner's own testimony regarding her high likelihood of relapse. There's also the information that she that she shares, in fact, where if the Philippines were to question her about her drug use, she would not lie to the government. I would also cite to the fact that in the record there is the expert testimony of Dr. Barbara Owen, who testifies to two key points regarding petitioner. And one is that she had a certain likelihood of petitioner's relapse into drug use due to losing all the support systems that she has in the U.S. as well. But counsel, counsel, you're I hear you on all that. But that just gets your client into the group of people who would come to the government's attention. Right. I'm talking about the back end likelihood that she would then face torture. I'm with you 100 percent on she would likely come to the government's attention one way or another as a drug user or past or present. Right. Either from that relapse or she would get put on one of these community watch lists. So that's the front end. But what the board, as I read it, was saying is that on the back end is that, OK, even assuming that you came to the government's attention, when we look at the numbers of people who have come to the government's attention, how many of them ended up being tortured for our purposes? And they say it seems like a relatively small number. And so on that basis, we don't think that you've met your burden. And I'm trying to figure out, OK, why is that so wrong that we can overturn it? I think Judge Watford, I think it is a case of comparing two numbers that might not necessarily have a clear connection. As I pointed out, the 8000 figure that the government and the BIA uses is simply a figure, a lowball figure that our expert gave in his declaration. If you look at the specific studies done by Human Rights Watch, as well as the broader context given by our expert, Dr. Raphael, we are very clear about appearing on a watch list. As Dr. Raphael says, appearing on a watch list is, in fact, being dealt a death sentence. And when you look at the Human Rights Report, Human Rights Watch Report, they give another figure that might be more informative, where they look at 24 police incidents in which the government went after people who had appeared on watch lists as drug users. And those 24 incidents resulted in 32 deaths. And what Human Rights Watch Report concluded there was that being on a drug watch list put them at, quote, grave risk of ending up being tortured and killed. So I'm not disputing the fact that there is that figure of 1.2 million people being turned in and only potentially 8000 or tens of thousands of people getting killed. I'm just saying that when you look at specific incidents where the government does go after people who have been reported as drug users, many of them do end up getting tortured or killed. I do see that I'm below my two minutes. So if there are not further questions about this, we'll hear from the government. Good morning, or good afternoon, depending on what coast you're on. My name is Dawn Conrad. And I'm here today on behalf of the Attorney General, may it please the court. The record in this case does not compel the finding that petitioner met her burden of proof for cat deferral. Petitioner has not used drugs in 16 years. Her claim is essentially that the Filipino government will become aware of her prior drug use, or she may relapse into future drug use and the government and the Filipino government will kill or torture petitioner once they become aware of this drug use. As Judge Watford noted, even if petitioner establishes by one of her methods that the Filipino government becomes aware of her prior or current or relapse drug use, the record does not compel the finding that she would more likely than not face torture or be killed in the Philippines. But you don't take the equally extreme position of saying that, you know, of the 1.2 million, she would have to show that 600,000 died to get relief, right? Correct? No, she wouldn't have to show a specific number like that. But she would have to show an individual individualized risk that there are similar situated individuals or she's faces a high individualized risk that she would be okay, likely to not be tortured. Remember what the record says on that, because I have it in the back of my mind that she says, Well, I do face a quite heightened risk as compared to the average drug user scattered throughout the country, because I would be back in Metro Manila is that right, and I would be relatively poor. And the statistics as to folks who fit that demographic group are quite alarming. Am I remembering that right? And if so, what do you have to say in response? I think she doesn't really show that she was at greater risk than the average person placed on a drug watch list or that might come to the government's attention. I think the record showed she does live in a community near Metro Manila. But there was at least I think expert evidence or in the country reports that it's a high percentage. People that are killed are I don't know if we have that evidence that she is from a really poor neighborhood. I know that we have evidence that her family, she testified that her family has some medical debt. But I don't think we have things in the record that indicate that she does face a particularized risk of torture. So one of her arguments is about what kind of records were sent from our government to the Philippines. And there's this whole argument about administrative notice on this report. But I don't understand why we don't know what was sent. Like, do you know what was sent? That exactly what was sent is not in the record that we have. I do know what documents were the basis of her final administrative removal order. And those documents are in the judgment, the complaint, and the I 213. And none of which mentioned her. They just discuss her conviction for murder. They don't talk about any of the drug related aspects. But there could be other documents beyond those. And you don't know whether other documents were sent. We don't have in the record what was sent. But what we have in the record is what was based on the final administrative or what the final administrative removal order was based on. And there's no indication that more than that would have been sent. I believe her argument is like the appellate decision in her case. And perhaps the transcripts of the court proceedings in her criminal case mentioned her drug use. But there's no indication that those were sent. But was did anyone ever look into this? Like, was there some stage of this proceeding where there could have been the equivalent of discovery to try to find out what was sent? The only thing that I know of, Your Honor, is that the DHS submitted those three documents that were the basis of her final administrative removal order. I'm not aware of any investigation about what was sent to the Philippines. So it's just odd because you're both arguing about what this manual might suggest should have happened. But it seems like we should be able to find out what actually happened. Is it possible to find out what actually was sent? That's a good question, Your Honor. I don't know if they could have called someone, an individual, to testify about that. But my response to that would be that's not necessary in this case because I still don't think the record compels, even if she comes to the attention of Filipino authorities, that she would more likely than not face torture. And we also have, I believe, a statement from their expert, Dr. Rafael, that said no known deportee to the Philippines had faced torture due to their past drug use. Can I ask just on the aggregation analysis? It did seem to me that there was an error on the Board's part in not taking into account the third theory, which is that put aside whether the documents, you know, alerted the Philippines government to her past drug use, put aside the likelihood that she would relapse and therefore become a present or current drug user. The third theory was that, you know, wholly apart from the Philippines government becoming aware of her past drug use as a result of those conviction documents, that her former neighbors would, oh, you're back after such a long time away, that curious minds would be able to, would be likely to inquire as, oh, I wonder what brought our former, or not even someone they might have known, but just what brought this person back from the United States after such a long absence, and that it would be very quickly discoverable. The circumstances surrounding her conviction, it's quite a notorious conviction, and obviously drug use is swept up in those facts, and so it seemed to me that was a third distinct theory as to how she would wind up on one of these watch lists and come to the government's attention that neither the Board nor the IJ ever really grappled with, and I wanted to hear your response on that point, please. Well, the Board did not specifically or explicitly address the watch list issue. The Board did adopt and affirm the IJ's decision, and the IJ's decision does find that she was unlikely to face, more likely than not, to face torture even if she did end up on a watch list, so. That's not really responsive to the question I posed. I grant you that's the back end likelihood, but I'm talking about the front end. Right, right. Well, I think that is, you have to establish two different things. Her burden is to establish two different things here. She has to establish, A, that the Filipino government or the drug authorities would become aware of her drug use in some way, and two, that she is more likely than not to be tortured once they become aware of that. So the IJ noted her watch list theory, but they found that she, let's see, the evidence does not establish that it's more likely than not that individuals placed on a government watch list are killed or tortured, and that is, I don't have the record site, but that is page 10 of the IJ's decision. Okay, you know, I had it as page 11, but I think I know where you're talking. Okay, I might have okay. I mean, yeah, that doesn't really satisfy me on the front end. That just to me is talking about the likelihood that even if you came to the attention of the Philippines government, we still don't think there's a high enough likelihood that you'd be tortured, and that's the debate we had a little earlier about the numbers and all that. I guess I was just trying to figure out, is that really what your case turns on? Because as I said, I perceive there being an analytical error on the aggregation front on the front end likelihood that she would come to the government's attention, because the agency seemed to take into account only two of her three theories. That's all I was trying to get at. Okay, I understand that, Your Honor. My response to that would be that if there was an error on the agency's part there, they corrected it because they, in the end, they considered the second part, that if she appears on the watch list, she is unlikely to, more likely than not, face torture. Yeah, okay, got it. Thank you. So the agency relied on the idea that she wouldn't relapse because she's been in recovery for 16 years. A lot of that time she was incarcerated and also has a support system here. So how is it reasonable to assume that that shows that she won't relapse in the Philippines? I think there were several factors. It was not just the fact that she had been 16 years, that she had been incarcerated. I think they looked at, I believe, Dr. Owen's character reference, which was about her commitment to rehabilitation, her hard working, and that she was willing, prepared to live a crime-free life. And they also considered whether she will return to anyone in the Philippines, and they determined that she would return to her family in the Philippines. So I think they looked at several factors in determining whether or not it was likely she would relapse. Any other points you'd like to make? If there's no further questions, we'll submit the case. Thank you. Thank you. You had about a little over a minute for rebuttal. I'll be quick, Your Honor. Two quick points. I think one is to speak to the 16 years of sobriety. I think as the government pointed out, I do believe that the main thing that the immigration court did rely on to predict that she would not relapse is the fact of her 16 years of sobriety. And as Judge Friedland pointed out, most of that time was while she was incarcerated. So one thing I wanted to note for this court is, as we cited in the briefing, the PIA is inexplicably departing from its own precedent regarding how much evidentiary value someone's past sobriety has. As we see in matter of CISD, which is from 2019, the PIA cited all the way back, so two decades back to a 1996 case, matter of Mendez, in which they said good conduct while you're incarcerated has no predictive value. There's no persuasive evidence there of predicting whether or not someone would relapse in the future. So that's a situation where the PIA is departing from its own precedent. Let me ask you this, your time is almost over. What is the relief that you're actually asking for? If we would agree with some, any of your arguments. Yes, your honor, we're currently asking for remand to the PIA. So that's certain. What would the PIA or the agency do on remand? On remand, the PIA could finish out the aggregate analysis. I believe, as your honors are pointing out, there are elements of Ms. Lagarde-Bougueren's torture risks that were simply not accounted for. And I think the one I would note is the fact that community members and neighbors could add her to the watch list as someone who was recently returned to the Philippines. So we believe that the board could go forward and do that correct aggregate analysis. And there is enough in the record to grant petitioner cap protection. Okay. Okay. Thank you. Thank you, counsel. We appreciate your arguments this morning, or this afternoon, wherever you might be. And the case is submitted at this time. And that ends our session for today.
judges: PAEZ, WATFORD, FRIEDLAND